# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PEGASUS EQUINE GUARDIAN ASSOCIATION<br><br>Plaintiff,<br><br>v.<br><br>U.S. ARMY and BRIGADIER GENERAL GARY M. BRITO, in his official capacity as Commanding General, JRTC and Fort Polk, Louisiana<br><br>Defendants. | Division:<br><br>Section:<br><br>Judge:<br><br>Magistrate Judge: |

*Ref. 137-002.2*

## **Complaint**

Plaintiff Pegasus Equine Guardian Association ("Pegasus") makes the following allegations against the U.S. Army (the "Army") and Brigadier General Gary M. Brito, in his official capacity as Commanding General, JRTC and Fort Polk, Louisiana for its Complaint:

## **Nature of the Case**

1. This case is about the horses at Fort Polk, including the "Kisatchie Horses," and the significant historic and cultural role they play in the landscape of the Fort Polk Military Installation and Kisatchie National Forest, and the Army's intention to eliminate them. The Kisatchie Horses are herds of undomesticated horses that have lived in the region for generations, and they are a critical component of the cultural history in Western Louisiana. The Army seeks to completely remove the horses from the land under its authority at the Fort Polk Military Installation and Kisatchie National Forest. However, the manner of removal will likely result in the slaughter of many Kisatchie Horses. The Army has not completed the requisite analysis of the impacts of its proposed actions on the horses as a part of the environment or as a

historical and culture resource, and has not proposed a range of alternatives that provide significant choices for properly managing the horses. Before it commits to a course of action with irreversible harm, it must complete an Environmental Impact Statement.

2. Although Kisatchie Horses have resided on land that now makes up the Fort Polk Military Installation and Kisatchie National Forest for generations, other horses also populate the area. Occasionally, individuals abandon horses that they can no longer care for on this property. Accordingly, the horses in the area are both undomesticated Kisatchie Horses that have been without significant human contact for generations, and abandoned domesticated horses that had depended on humans for survival and are comfortable with human presence (collectively “the horses”). The Army did not distinguish between domesticated and undomesticated horses when they assessed the risks the horses pose or the likely success of different removal measures. For example, domesticated horses that were raised and cared for by people will be more adoptable than undomesticated horses that have had minimal human contact their entire lives.

3. The Army seeks to eliminate the horses from the Fort Polk Military Installation and Kisatchie National Forest, citing concerns for military personnel and training capabilities. The Army’s plan relies on nonprofit organizations, or private individuals or entities, to adopt (or relocate) the horses. Most nonprofit animal welfare organizations do not have the capacity or resources to accept many more horses. Since many of the horses are undomesticated, they are not attractive to individuals seeking to adopt a riding horse. The Army will sell horses that are not adopted. But horses sold at auction are often bought by kill-buyers, and transported to slaughterhouses in Mexico and Canada. Because most of the horses are unlikely to be adopted, many of the horses that have resided in the Fort Polk Military Installation and Kisatchie National Forest for generations will likely be killed.

4. The Army has committed to its course of action without assessing the harm to the horses themselves, without considering a proper range of alternatives to its course of action, without including the most basic baseline data in the analysis, and without completing an analysis of the adverse effects on historical and cultural resources. The Army has made its final decision and has already begun removing horses from Fort Polk.

5. Before the Army commits an irreversible and significant change to the landscape of west-central Louisiana, it must complete further analysis on the impacts of the removal, the alternatives available, and actions the Army can take to mitigate harm. Thus, Pegasus asks this court to declare the Army's action illegal and enjoin it from authorizing the removal of any horses until it publishes an environmental impact statement and completes a historical and cultural resources analysis.

## Jurisdiction and Venue

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case concerns federal questions under the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*; the National Historical Preservation Act, 54 U.S.C. § 300101, *et seq.*; the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

7. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1), which provides: "A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity . . . or an agency of the United States . . . may . . . be brought in any judicial district in which (A) a defendant in the action resides."

8. The Army maintains a Baton Rouge, Louisiana recruitment office, thus the Army resides in the Middle District of Louisiana and is within the jurisdiction of this Court.

**Parties**

*Plaintiff*

9. Pegasus is a non-profit corporation organized under the laws of Louisiana. Pegasus is a regional conservation organization dedicated to protecting wild and free roaming equines at the Fort Polk Military Installation ("Fort Polk") (including the Peason Ridge area), and Kisatchie National Forest ("Kisatchie"). Pegasus has members who live or work near Fort Polk and Kisatchie. Members also recreate in and enjoy the landscape of Fort Polk and Kisatchie.

10. Pegasus is a non-profit corporation organized under the laws of the State of Louisiana, and is therefore a "person" under the Administrative Procedures Act. 5 U.S.C. §§ 551(2) & 701(b)(2).

11. Pegasus has members who use and enjoy the areas where the horses roam, including Fort Polk and Kisatchie. The Plaintiff has members who depend on the lands of Fort Polk and Kisatchie for recreation and as part of their cultural heritage. *See* Robertson Decl., Ex. A.

12. The violations alleged in this Complaint injure the Plaintiff's members by denying them the information they need to effectively participate in government decisions that impair their use and enjoyment of the landscape and environment at Fort Polk and Kisatchie. The decisions also threaten to destroy a critical part of their cultural heritage. Likewise, Plaintiff's members are harmed when the Army fails to consider the impact of its actions on the environment and on historical and cultural property that they use and enjoy, when they lose the opportunity to comment on meaningful alternatives and mitigation measures to the proposed

undertaking, and when the Army fails to mitigate the impact of its actions on the environment. Thus, the Army's actions will adversely affect and aggrieve the Plaintiff.

13. Plaintiff's members, including members who are part of the "Heritage Families" whose ancestors owned land where Fort Polk is currently located, will permanently lose a critical part of the landscape that they rely on to retain and celebrate their cultural and historical heritage if the Army permanently removes the Kisatchie Horses.

14. These injuries are actual, concrete, and irreparable and will adversely affect and aggrieve the Plaintiff. They cannot be redressed by monetary damages. The requested relief will redress these injuries.

15. Plaintiff's members also will permanently lose a critical part of the environment that they enjoy at Fort Polk and Kisatchie if the horses are removed. These injuries are actual, concrete, and irreparable and will adversely affect and aggrieve the Plaintiff. They cannot be redressed by monetary damages. The requested relief will redress these injuries.

16. This suit is germane to Pegasus's purposes.

17. Neither the claims asserted nor the relief requested in this case requires the participation of any of the Plaintiff's members in this suit.

*Defendants*

18. Defendant Brigadier General Gary M. Brito is the U.S. Army Commanding General at Fort Polk. Plaintiff sues Brigadier General Brito in his official capacity as the federal officer responsible for compliance with any injunction that this Court issues. Brigadier General Brito is sued solely in his official capacity.

19. Defendant U.S. Army is an administrative agency of the federal government as defined by the APA. 5 U.S.C. § 701(b)(1).

20. The Army issued an Environmental Assessment and Finding of No Significant Impact to remove horses from Fort Polk in violation of the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*.

21. The Army also failed to conduct the required analysis under the National Historic Preservation Act of its decision to eliminate the historic Kisatchie Horses on Fort Polk and Kisatchie. 54 U.S.C. § 300101, *et seq*.

## Legal Background

### *Administrative Procedure Act*

22. The APA provides for judicial review of final agency actions. 5 U.S.C. § 704.

23. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

24. The APA authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . without observance of procedure required by law; . . . or unwarranted by the facts . . . ." 5 U.S.C. § 706(2).

25. The term "arbitrary and capricious" includes decisions where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

*National Environmental Policy Act*

26. The National Environmental Policy Act ("NEPA") requires that "all agencies of the Federal Government shall . . . include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official" on the environmental impacts of, and alternatives to, the proposed action. 42 U.S.C. § 4332(2)(C). This detailed statement is known as an environmental impact statement ("EIS"). 40 C.F.R. § 1508.11.

27. "Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly." 40 C.F.R. § 1508.18.

28. To determine if a major federal action "*significantly* affect[s] the quality of the human environment," the agency must consider "both context and intensity." 40 C.F.R. § 1508.27 (emphasis added). Considerations of context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action." *Id*. § 1508.27(a). Intensity "refers to the severity of impact." When evaluating intensity, the agency should consider the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources" and "[t]he degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources." 40 C.F.R. § 1508.27(a)(3), (8).

29. Under NEPA, an agency may perform an environmental assessment ("EA") to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1).

30. Under 32 C.F.R. § 651.34, the Army must include in its EA:

- "The alternatives considered, including appropriate consideration of the "No Action" alternative, the "Proposed Action," and all other appropriate and reasonable alternatives that can be realistically accomplished. In the discussion of alternatives, any criteria for screening alternatives from full consideration should be presented, and the final disposition of any alternatives that were initially identified should be discussed."
- "[T]he general conditions and nature of the affected environment and…the environmental setting against which environmental effects are evaluated. This should include any relevant general baseline conditions focusing on specific aspects of the environment that may be impacted by the alternatives."
- "Environmental consequences of the proposed action and the alternatives. The document must state and assess the effects (direct, indirect, and cumulative) of the proposed action and its alternatives on the environment, and what practical mitigation is available to minimize these impacts. Discussion and comparison of impacts should provide sufficient analysis to reach a conclusion regarding the significance of the impacts, and is not merely a quantification of facts."
- "Conclusions regarding the impacts of the proposed action. A clear statement will be provided regarding whether or not the described impacts are significant. If the EA identifies potential significant impacts associated with the proposed action, the conclusion should clearly state that an EIS will be prepared before the proposed action is

implemented. If no significant impacts are associated with the project, the conclusion should state that a FNSI will be prepared. Any mitigations that reduce adverse impacts must be clearly presented. If the EA depends upon mitigations to support a resultant FNSI, these mitigations must be clearly identified as a subsection of the Conclusions."

31. The Army is obligated to prepare an EIS "when a proponent, preparer, or approving authority determines that the proposed action has the potential to:

- "Significantly affect historic (listed or eligible for listing in the National Register of Historic Places, maintained by the National Forest Service, Department of Interior), or cultural, archaeological, or scientific resources, public parks and recreation areas, wildlife refuge or wilderness areas, wild and scenic rivers, or aquifers" (32 C.F.R. § 651.41(b));
- "Result in significant or uncertain environmental effects, or unique or unknown environmental risks" (32 C.F.R. § 651.41(d));
- "Either establish a precedent for future action or represent a decision in principle about a future consideration with significant environmental effects" (32 C.F.R. § 651.41(f));
- "Be highly controversial from an environmental standpoint" (32 C.F.R. § 651.41(i)); or
- "Cause loss or destruction of significant scientific, cultural, or historical resources." 32 C.F.R. § 651.41(j).

*National Historic Preservation Act*

32. The National Historic Preservation Act ("NHPA") requires that "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted

undertaking . . . prior to the approval of the expenditure of any Federal funds . . . shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108.

33. "Undertaking means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y).

34. "Historic property means any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior." 36 C.F.R. § 800.16(l)(1).

35. Cultural landscapes can be listed on the National Register of Historic Places. A cultural landscape is "a geographic area, including both cultural and natural resources and the wildlife or domestic animals therein, associated with a historic event, activity, or person or exhibiting other cultural or aesthetic values." Charles A. Birnbaum, *Protecting Cultural Landscapes: Planning, Treatment and Management of Historic Landscapes*, U.S. Department of the Interior, National Park Service, Cultural Resources Division, Preservation Brief 36, 1 (1994) (available at https://www.nps.gov/tps/how-to-preserve/preservedocs/preservation-briefs/36Preserve-Brief-Landscapes.pdf).

36. There are four general types of cultural landscapes, not mutually exclusive: Historic Sites, Historic Designed Landscapes, Historic Vernacular Landscapes, and Ethnographic Landscapes. *Id.*

37. A Historic Vernacular Landscape is "a landscape that evolved through use by the people whose activities or occupancy shaped that landscape. Through social or cultural attitudes of an individual, family or a community, the landscape reflects the physical, biological, and

cultural character of those everyday lives. Function plays a significant role in vernacular landscapes… Examples include…agricultural landscapes." *Id.* at 2.

38. An Ethnographic Landscape is "a landscape containing a variety of natural and cultural resources that associated people define as heritage resources. Examples are contemporary settlements, religious sacred sites and massive geological structures. Small plant communities, animals, subsistence and ceremonial grounds are often components." *Id.*

39. The NHPA can also directly protect culturally significant wild animals. *See Okinawa Dugong v. Gates*, 543 F. Supp. 2d 1082, 1091 (N.D. Cal. 2008) (characterizing the dugong, a marine mammal related to the manatee, as "a specific property of cultural and historical significance" under NHPA).

40. The agency "shall take the steps necessary to identify historic properties within the area of potential effects." Accordingly, the agency must "make a reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation, [and] oral history interviews." 36 C.F.R. § 800.4(b)(1).

41. Once the agency has identified a historical property, the agency must "apply the criteria of adverse effect to historic properties within the area of potential effects." 36 C.F.R. § 800.5(a). "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). When applying the criteria of adverse effect, "[t]he agency official shall consider any views concerning such effects which have been provided by consulting parties and the public." 36 C.F.R. § 800.5(a).

## Facts

42. On August 2, 2015, the Army issued a public notice entitled "Notice of Intent to Conduct an Environmental Assessment for Proposed Action to Eliminate Trespass Horses at Fort Polk, LA." The Army solicited public comments to help it determine the appropriate scope of the EA and appropriate alternative actions. The notice was published in several newspapers and online. The Army received more than 700 public comments.

43. Pegasus members commented during that scoping phase.

44. On May 4, 2016, the Army made the Environmental Assessment and Draft Finding of No Significant Impact ("FONSI") available for public review with a thirty-day comment period. The deadline was extended until June 17, 2016. The Army received 180 comments in response to the plan.

45. Pegasus commented on these documents.

46. Pegasus members also commented on these documents.

47. On August 8, 2016 the Army published a FONSI. The Brigadier General concluded that none of the proposed alternative Courses of Action (COA) would have a significant impact on the environment. Therefore, he concluded that the Army does not need to prepare an Environmental Impact Statement.

48. In the FONSI, Brigadier General Brito announced that the Army would implement alternative COA 7 as described in the EA, and modified by the FONSI. Fort Polk personnel will initiate the capture of horses, in groups of ten to thirty horses. As capture becomes more difficult, contract personnel would manage capturing remaining horses. The Army will create a list of charitable nonprofit (26 U.S.C. § 501(c)(3)) animal welfare organizations and a list of members of the public that could potentially adopt the horses. The Army will first contact

adopter organizations on the list, and the organization will have three working days to notify Fort Polk that it will take the horses, and eight days to pick them up. If an adopter organization fails to respond within three days, declines to take all available horses, or fails to pick up horses within the eight-day deadline, that organization will be permanently removed from the adopter list and not be permitted on future lists absent a showing of good cause. If no adopter organizations are on the list or pick up the horses, the Army will then offer horses to people or entities in the give-away list. They will have forty-eight hours to notify Fort Polk that they will adopt the horse(s), and five days to pick them up. If they fail to pick up the horse(s), they will be permanently removed from the giveaway list. All remaining horses with either be transported to a livestock sale facility or will be combined to the next lot of captured horses to cycle through the process again. The process will then continue until all horses are eliminated from Fort Polk. Additionally, Fort Polk may relocate the horses to a private landowner or other government entity.

49. The Army has committed to its course of action without assessing the harm to the horses themselves, without considering a proper range of alternatives to its course of action, without including the most basic baseline data in the analysis, and without completing an analysis of the adverse effects on historical and cultural resources. The Army has made its final decision and has already begun removing horses from Fort Polk.

50. The Army did not issue an Environmental Impact Statement regarding the Fort Polk horse-removal project.

51. The Army did not issue a Cultural Impact Statement regarding the Fort Polk horse-removal project.

52. The Army did not issue any report or statement under the NHPA regarding the Fort Polk horse-removal project.

53. In the early 1800's, settlers and homesteaders, including Pegasus members' ancestors, began to settle Peason Ridge. They brought horses with them.

54. According to historian Steven Smith, the first Anglo-American settlers in this region also often found wild horses and cattle in the woods. Smith, A Good Home for a Poor Man (1999), *available at* http://scholarcommons.sc.edu/cgi/viewcontent.cgi?article=1049 &context=anth_facpub.

55. These settlers set aside sixteen sections of land exclusively for grazing, and horses have remained on that property since that time.

56. In the 1940's, the Army used eminent domain to take possession of the property and homes owned by these families. That property became Fort Polk.

57. The Army refers to these families who lost their property, and their living descendants, as the Heritage Families.

58. For about the last ten years, the members of the Heritage Families have had a reunion. They stay connected throughout the year as well.

59. The members of the Peason Ridge Heritage Families see the Peason Ridge landscape and the horses that roam there as a part of their history and heritage.

**<u>First Cause of Action</u>**

(*NEPA Violation: Failure to meet the requirements for an EA*)

60. The Army's EA was not sufficient and failed to assess critical issues.

61. The Army failed to assess the impacts of proposed actions on the horses themselves.

62. The horses are part of the environment.

63. Without assessing how the removal of horses would affect the horses, the Army arbitrarily and capriciously failed to “state and assess the effects (direct, indirect, and cumulative) of the proposed action and its alternatives on the environment” (32 C.F.R. § 651.34) and did not have an adequate basis to determine that there was no significant impact.

64. The Army failed to identify how many horses populate Fort Polk lands or their roaming patterns. Accordingly, the Army failed to consider “relevant general baseline conditions focusing on specific aspects of the environment that may be impacted” in the Environmental Assessment, in violation of 32 C.F.R. § 651.34(e). Without considering critical baseline data, the Army was unable to make an informed decision on the proper course of action, necessitating further analysis.

65. Therefore the Army arbitrarily and capriciously failed to consider “relevant general baseline conditions focusing on specific aspects of the environment that may be impacted by the alternatives.” 32 C.F.R. § 651.34.

66. Although the Army proposed six alternatives and a no-action alternative in the EA, the alternatives essentially provide just two options: no action and total elimination.

67. Therefore the Army arbitrarily and capriciously failed to consider “all other appropriate and reasonable alternatives that can be realistically accomplished.” 32 C.F.R. § 651.34.

68. Further, in each alternative, the Army relies on non-profit rescue organizations or private individuals to adopt or relocate the horses before the horses are auctioned off. But the Army does not determine that animal rescue organizations or private individuals/entities have the capacity and the interest to adopt the horses. Without this information, there is no basis to

determine that these alternative COAs are reasonable and can be realistically accomplished.

69. Therefore the Army arbitrarily and capriciously failed to consider "all other appropriate and reasonable alternatives that can be realistically accomplished." 32 C.F.R. § 651.34.

70. Additionally, the Army only gives nonprofit organizations three days to decide if they can adopt the horses after notifying them, and eight days to pick up the horses. Likewise, individuals/entities only have two days to notify Fort Polk that they will adopt the horses, and five days to pick them up. Fort Polk is in a rural part of the state, and most organizations or individuals will have to travel to pick up the horses. Even if potential adopters have the capacity and interest in adopting Kisatchie Horses, coordinating the logistics to transport large animals across long distances is challenging and time-consuming. Further, caring for horses requires a serious financial, time, and space investment, which many organizations and individuals cannot commit to in just a few days. As a result, the alternative COAs makes it difficult for organizations or individuals to adopt the horses. The Army did not analyze the reliability or feasibility of placing a significant portion of the horses before selecting its course of action.

71. Therefore the Army arbitrarily and capriciously failed to consider "all other appropriate and reasonable alternatives that can be realistically accomplished." 32 C.F.R. § 651.34.

72. Each alternative (besides the no-action COA) provides that if individuals or organizations do not volunteer to adopt the horses, the horses will be sold. Some alternatives planned to euthanize horses not sold. Auctions are frequented by kill-buyers, which purchase horses and transport them to slaughterhouses in Mexico or Canada. Under any alternative, if horses are not adopted, there is a substantial likelihood they will be killed. The Army failed to

analyze the likelihood that the horses would ultimately be killed.

73. Therefore the Army arbitrarily and capriciously failed to "state and assess the effects (direct, indirect, and cumulative) of the proposed action and its alternatives on the environment" (32 C.F.R. § 651.34) and did not have an adequate basis to determine that there was no significant impact.

74. The Army did not consider alternatives that prevent interference with Army activities by reducing or managing the horse population in Fort Polk and Kisatchie rather than totally eliminating the horse population.

75. Therefore the Army arbitrarily and capriciously failed to consider "all other appropriate and reasonable alternatives that can be realistically accomplished." 32 C.F.R. § 651.34.

76. The Army did not consider the different types or groups of horses and their particular ranges, but instead treated all of the horses as one monolithic group. But the Kisatchie Horses are significantly different from domesticated horses that are abandoned on Fort Polk, and the Army should have considered different management options for different horse groups.

77. Therefore the Army arbitrarily and capriciously failed to consider "all other appropriate and reasonable alternatives that can be realistically accomplished" and "relevant general baseline conditions focusing on specific aspects of the environment that may be impacted by the alternatives." 32 C.F.R. § 651.34.

78. The Army failed to directly discuss mitigation measures for the impacts of the alternative COAs on the horses.

79. Therefore the Army arbitrarily and capriciously failed to "clearly present" in its EA "any mitigations that reduce adverse impacts" and "clearly identif[y mitigations] as a subsection of the Conclusions." 32 C.F.R. § 651.34.

80. These failures adversely affect and aggrieve the Plaintiff by denying the Plaintiff and its members legally mandated opportunities to participate in and be informed by the NEPA process.

**Second Cause of Action**

(*NEPA Violation: Failure to provide an EIS*)

81. Further, the Army violated 42 U.S.C. § 4332 and 32 C.F.R. § 651.41 by failing to create an EIS, in light of:

- the highly controversial nature of this removal, evidenced by the approximately 880 comments the Army received in connection to the EA, and the creation of organizations, like Pegasus, for the sole purpose of protecting the horses (*see* 32 C.F.R. § 651.41(i));
- the irreversible loss of a significant cultural and historical resource removing Kisatchie Horses will cause (*see* 32 C.F.R. § 651.41(j));
- the significant adverse historical and cultural effects the Army's removal of Kisatchie Horses from the land they have roamed for generations will have on the landscape and the community (*see* 32 C.F.R. § 651.41(b);
- the potential for significant, unique, and unknown environmental effects of removing horses, because of the unknown future of horses once sold and the unknown (and unevaluated) effects of the removal on the animals themselves and on their traditional environment (*see* 32 C.F.R. § 651.41(d)); and

- the potential for this type of round-up to become a norm in both the Fort Polk and Kisatchie area and other Army lands in the South (*see* 32 C.F.R. § 651.41(f)).

82. These failures adversely affect and aggrieve the Plaintiff by denying the Plaintiff and its members legally mandated opportunities to participate in and be informed by the NEPA process.

**Third Cause of Action**

(*Violation of National Historic Preservation Act*)

83. The NHPA requires that "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking . . . prior to the approval of the expenditure of any Federal funds . . . shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. The agency must "apply the criteria of adverse effect to historic properties within the area of potential effects" by considering how the proposed action "would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a), (a)(1).

84. But the Army failed to take into account how its horse-removal program would adversely affect historic properties.

85. The Army's horse-removal program is an "undertaking" under the NHPA, where "Undertaking means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency…" 36 C.F.R. § 800.16

86. The Army's horse-removal program is "a type of activity that has the potential to cause effects on historic properties," including the Peason Ridge landscape, under 36 C.F.R. § 800.3.

87. Therefore, the Army should have determined and documented the area of potential effect, reviewed existing information on historic properties, and consulted with affected parties. 36 C.F.R. § 800.4(a), but it failed to do so.

88. The Army also failed to "take the steps necessary to identify historic properties within the area of potential effects." 36 C.F.R. § 800.4(b).

89. The Army failed to evaluate the historic significance of the properties within the area of potential effects. 36 C.F.R. § 800.4(c).

90. The Army failed to determine either:

- (1) that no historic properties that are affected (either there are no historic properties present or there are historic properties present but the undertaking will have no effect upon), in which case the Army should have provided documentation of this finding, as set forth in § 800.11(d), and notified all consulting parties, and made the documentation available for public inspection *prior to* approving the undertaking. 36 C.F.R. § 800.4(d)(1). Or
- (2) that historic properties are affected, in which case the Army should have notified all consulting parties and invited their views on the effects and assessed adverse effects. 36 C.F.R. § 800.4(d)(2)

91. The Peason Ridge Landscape is a historic site, and may be eligible for inclusion on the National Register of Historic Places.

92. The Kisatchie Horses are a contributing element of that historic and cultural landscape.

93. Further, the Kisatchie Horses may be independently eligible for inclusion in the National Register of Historic Places. *See* 36 C.F.R. § 800.16(l)(1); *Okinawa Dugong v. Gates*,

543 F.Supp. 2d 1082, 1091 (N.D. Cal. 2008) (characterizing a marine mammal as a historic property under NHPA).

94. These failures adversely affect and aggrieve the Plaintiff by denying the Plaintiff and its members legally mandated opportunities to participate in and be informed by the NHPA process.

**Fourth Cause of Action**

(*Arbitrary Agency Action*)

95. Upon information and belief, the Army's administrative record for the EA lacks sufficient analysis to support a Finding of No Significant Impact.

96. Upon information and belief, the administrative record indicates that the Army failed to assess the impact of the action on the horses.

97. Upon information and belief, the administrative record indicates that the Army failed to consider a range of alternatives, and instead considered essentially two actions: no action or total elimination.

98. Upon information and belief, the administrative record indicates that the Army failed to consider mitigation measures, in violation of NEPA regulations.

99. Upon information and belief, the Army failed to initiate or complete any NHPA analysis on the impact of the undertaking on historical properties.

100. The Army's failure to publish an adequate EA under 32 C.F.R. § 651.34 is arbitrary and capricious.

101. The Army's failure to create an EIS is arbitrary and capricious.

102. The Army's decision to initiate a course of action without sufficient analysis is arbitrary and capricious.

103. The Army's failure to complete any NHPA analysis is arbitrary and capricious.

104. These failures adversely affect and aggrieve the Plaintiff by denying the Plaintiff and its members legally mandated opportunities to participate in and be informed by the NEPA and NHPA processes.

## Prayer for Relief

WHEREFORE, PLAINTIFF prays for the following relief:

A. Declare that Defendants violated the National Environmental Policy Act, and its implementing regulations, in preparing the Environmental Assessment:

1. by failing to assess the impact on the horses;
2. by failing to provide critical data in the Environmental Assessment regarding horse populations and roaming patterns necessary to develop a range of alternatives;
3. by failing to adequately analyze the impacts of this project on horses scheduled to be adopted, sold at auction, or euthanized;
4. by failing to explore and objectively evaluate a reasonable range of alternatives including, for example, an alternative that would physically protect areas used for training grounds without totally eliminating the horses from Fort Polk and Kisatchie in entirety; and
5. by failing to assess mitigation measures.

B. Declare that Defendants violated the National Environmental Policy Act, and its implementing regulations by failing to prepare an Environmental Impact Statement.

C. Declare the Defendants violated National Historical Preservation Act by failing to follow the study, analysis, publication and consultation requirements regarding its horse-removal project's effects on historic properties.

D. Declare that Defendants' actions as set forth in this complaint are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, contrary to the Administrative Procedures Act.

E. Enjoin the Army from removing horses from Fort Polk or Kisatchie lands, unless and until the Army has prepared an Environmental Impact Statement pursuant to the National Environmental Policy Act and accompanying regulations.

F. Also or in the alternative, enjoin the Army from removing horses from Fort Polk or Kisatchie lands, unless and until the Army has prepared Environmental Assessment that fully complies with the statutory prescriptions set forth in the National Environmental Policy Act and accompanying regulations.

G. Enjoin the Army from removing horses from Fort Polk or Kisatchie lands, unless and until the Army has prepared has fully complied with the statutory prescriptions set forth in National Historic Preservation Act and accompanying regulations.

H. Award Plaintiff reasonable attorney fees, cost and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 or other authority; and

I. Grant Plaintiff such additional and further relief, as this Court may deem just and equitable.

Respectfully submitted on December XX, 2016,

s/ Sam Pfotenhauer
Samantha Pfotenhauer, Student Attorney
Tulane Environmental Law Clinic

s/ Machelle Hall
Machelle Lee Hall, La. Bar 31498
Lisa W. Jordan, La. Bar 20451
6329 Freret Street
New Orleans, LA 70118-6321
Phone: (504) 862-8819
Fax: (504) 862-8721
Email: mhall@tulane.edu
*Counsel for Pegasus Equine Guardian Association*

**Notice of Supervising Attorney's Introduction of Student Practitioner**

I, Machelle Hall, respectfully introduce student attorney Samantha Pfotenhauer to this Court pursuant to Local Rule 83(b)(15). The student practitioner is duly enrolled in Tulane Law School, a law school approved by the American Bar Association. The student practitioner has completed four full-time semesters of legal studies and has taken the oath set forth in Local Rule 83(15)(D)(vi). As the student practitioner's supervising attorney, I approve of student practitioner's appearance in this case. Further, I have attached a Dean's certification relating to the student practitioner as Exhibit B, the client's written consent to appearances by student practitioners on its behalf as Exhibit C, and the student attorney's oath as Exhibit D.

Respectfully submitted on December 14, 2016,

s/ Machelle Hall
Machelle Lee Hall, La. Bar 31498
6329 Freret Street
New Orleans, LA 70118-6321
Phone: (504) 862-8819
Fax: (504) 862-8721
Email: mhall@tulane.edu
*Counsel for Pegasus Equine Guardian Association*